# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30441

United States Court of Appeals
Fifth Circuit

**FILED**
March 20, 2018

Lyle W. Cayce
Clerk

ECOSYSTEM INVESTMENT PARTNERS,

> Plaintiff - Appellant

v.

CROSBY DREDGING, L.L.C.; UNITED STATES OF AMERICA,

> Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CV-16504

Before KING, ELROD, and GRAVES, Circuit Judges.

PER CURIAM:*

Ecosystem Investment Partners (EIP) invests in projects which restore, build, improve, and protect natural resources. For its efforts, the Government compensates EIP with environmental-mitigation credits. EIP then sells those credits to entities seeking to offset their ecologically destructive actions.

This lawsuit arose after the Army Corps of Engineers decided to build new wetlands to offset environmental damage from another one of its projects.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30441

EIP sued the Corps and the Corps' contractor, alleging that the Corps violated the National Environmental Policy Act (NEPA) by deciding to build its own wetlands without considering whether EIP's credits were a reasonable alternative. EIP asked the district court to order the Corps not to build the new wetlands. EIP's lawsuit was dismissed, and it took this appeal.

We agree with the district court that EIP lacks statutory standing to sue. EIP has not alleged an environmental injury that would place it within NEPA's zone of interests. Accordingly, EIP lacks a legislatively conferred cause of action, and thus we AFFIRM.

## I.

After Hurricane Katrina devastated New Orleans in 2005, Congress authorized and funded the United States Army Corps of Engineers to develop a storm-and-flood-protection system in southeast Louisiana. This Hurricane and Storm Damage Risk Reduction System (HSDRRS) was to involve the construction of a series of canals, floodwalls, and levees. This sort of development obligated the Corps under the Water Resources Development Act of 1986 (WRDA) to produce a report with "a specific plan to mitigate for damages to ecological resources." *See* 33 U.S.C. § 2283(d)(1). As the mitigation report pertained to a "major Federal action[] significantly affecting the quality of the human environment," the Corps was required under NEPA to prepare an environmental-impact statement (EIS) detailing "the environmental impact of" and "alternatives to" its proposed action. *See* 42 U.S.C. § 4332(C)(i), (iii); 40 C.F.R. § 1508.11 (defining EIS).

To expedite its NEPA analysis, the Corps and the Council on Environmental Quality (the body charged with overseeing the implementation of NEPA, *see* 42 U.S.C. §§ 4342–4344), agreed to an emergency arrangement. *See* 40 C.F.R. § 1506.11. Under the arrangement, the Corps would issue individual environmental reports (IERs). This would allow the Corps to

2

consider the impact of its actions piecemeal rather than omnibus in the hopes of accelerating the project.

Of relevance to this appeal are a pair of IERs analyzing the Corps' plans to offset the HSDRRS's destruction of brackish marsh in and near Lake Pontchartrain (a lake directly to the north and east of New Orleans). For those unfamiliar with coastal-wetland ecology, brackish marshes are moderately salty marshes that form upstream of salt marshes and whose salinity is diluted by the influx of fresh water from coastal rivers. The Corps' first IER contemplated that the HSDRRS's brackish-marsh destruction could be offset with credits purchased from Corps-approved mitigation banks. Mitigation banks, per Corps regulation, are sites "where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by [Corps] permits." *See* 33 C.F.R. § 332.2. The Corps releases credits to the mitigation bank's sponsor, who will then usually sell its "credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor." *See id.*

But less than a year after this IER, which contemplated the use of mitigation banks, the Corps reversed course in a supplemental IER (SIER). Instead of buying credits to offset its destruction of brackish marsh, the Corps decided to build its own replacement marshes. To that effect, the Corps decided to build three mitigation projects. The New Zydeco Ridge project is the third of these projects and the subject of this lawsuit. The Corps awarded the contract for the New Zydeco Ridge project to Crosby Dredging, LLC. Three days later, EIP brought this lawsuit.

EIP sued the Corps and Crosby Dredging and asked the district court to enjoin construction of the New Zydeco Ridge project. EIP's complaint alleges that it owns the only Corps-approved brackish-marsh mitigation bank in the

No. 17-30441

Lake Pontchartrain region. To offset brackish-marsh destruction in the region, the Corps calculated that it needed a total of 118 mitigation units (known as Average Annual Habitat Units, or AAHUs). When the Corps first issued its SIER, EIP claims that it had credits worth 3.0 AAHUs available for sale or transfer to offset this brackish-marsh destruction. Nine months later—but a full year and a half before the Corps awarded the contract to Crosby Dredging—the Corps released more credits to EIP, bringing EIP's credit total up to a value of 25 AAHUs. By contrast, the New Zydeco Ridge project would provide, EIP asserts, only 23.7 AAHUs in mitigation out of the 118 needed.

Based on this, EIP claimed the Corps violated NEPA in two ways. The Corps violated NEPA, according to EIP, when it issued its SIER without considering the alternative of purchasing EIP's credits. *See* 42 U.S.C. § 4332(C)(iii) (requiring a list of "alternatives to the proposed action"). And the Corps violated NEPA again, per EIP's complaint, when it did not supplement its NEPA analysis after the value of EIP's credits reached 25 AAHUs. *See* 40 C.F.R. § 1502.9(c)(1)(ii) (requiring a supplement when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arise). As NEPA does not afford private litigants a cause of action to enforce its provisions, *see Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc), EIP brought its claim through section 10(a) of the Administrative Procedure Act (APA), *see* 5 U.S.C. § 702.

Both defendants moved to dismiss based on failure to state a claim under Rule 12(b)(6).[1] The district court granted the motions, holding that EIP lacked

---

[1] Crosby Dredging also moved to dismiss based on a lack of subject matter jurisdiction under Rule 12(b)(1). The district court granted Crosby Dredging's 12(b)(1) motion, but gave no indication that it was dismissing based on a lack of Article III standing—a jurisdictional defect—rather than statutory standing—a defect in the plaintiff's ability to state a cause of action. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011).

No. 17-30441

statutory standing and, alternatively, had not pleaded a violation of NEPA.[2] The court ruled that EIP lacked statutory standing because its only injury was a lost business opportunity, an injury type outside of NEPA's zone of interests.

On appeal, the defendants urge us to affirm dismissal based on lack of Article III and statutory standing. We examine both matters de novo, *see Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), starting (as we must) with Article III standing, *see Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011). We ultimately conclude that EIP has Article III standing but no statutory standing—that is, it lacks a "legislatively conferred cause of action." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.4 (2014).

## II.

The oft-repeated requirements of Article III standing are that the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). These three requirements form the "irreducible constitutional minimum" of standing. *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). But when a plaintiff asserts a procedural right, as is the case here, we do not hold him "to the normal standards for redress[a]bility and immediacy." *See Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998)

---

Because we conclude that EIP has Article III standing, the district court erred by granting the 12(b)(1) motion. "Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." *See id.* Nevertheless, we affirm the district court's judgment, as its dismissal based on failure to state a claim was proper. *See United States v. El-Mezain*, 664 F.3d 467, 540 (5th Cir. 2011) ("We may affirm the district court's ruling on any ground supported by the record.").

[2] Because we affirm based on a lack of statutory standing, we do not reach the question of whether EIP pleaded a violation of NEPA.

5

(citing *Lujan*, 504 U.S. at 572 n.7). A NEPA plaintiff need not show that his requested remedy "will in fact redress his injury" but only that "there is a *possibility* that the procedural remedy will redress his injury." *See id.* (emphasis added); *see also Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167 (5th Cir. 2012) (applying this reasoning to NEPA).

That said, Article III's requirements may not be relaxed to the point of oblivion. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*"—will not do. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Without a "tangible personal injury," the plaintiff would only be suing to enforce "his and every citizen's interest in proper application of the Constitution and laws." *Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 467–68 (5th Cir. 2011) (per curiam) (quoting *Lujan*, 504 U.S. at 573).

In this case, EIP tries to "establish standing in its own name" and thus must satisfy "the same standing test that applies to individuals." *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). Dismissal due to lack of Article III standing is proper based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *See Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017) (quoting *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). As the party invoking a federal court's jurisdiction, EIP has the burden to show Article III standing. *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1737 (2016). We are satisfied that EIP has met this burden.

Starting with injury in fact, EIP asserts a concrete and particularized economic injury—"a quintessential injury upon which to base standing."

No. 17-30441

*See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006).[3] EIP pleaded that it owns the "only available mitigation bank that could have been used by the Corps" and that by failing to consider alternatives, the Corps "bypassed use of EIP's" mitigation bank. This deprived EIP of any chance it had to immediately sell its banked credits.

This sort of injury falls squarely within a well-established line of cases holding that loss of a non-illusory opportunity to pursue a benefit constitutes injury in fact. *See, e.g.*, *N.J. Television Corp. v. FCC*, 393 F.3d 219, 221 (D.C. Cir. 2004). "[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *See Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (alteration in original) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). This rule originates from the equal-protection context, where the Supreme Court recognizes injury in fact based on a denial of an equal opportunity to compete—say, for housing which the plaintiff would otherwise be qualified for, *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977), for every spot in a medical-school class, *see Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265,

---

[3] The defendants argue that EIP cannot establish an Article III injury in fact because it failed to plead an environmental injury. "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). It is true that the typical plaintiff who alleges a procedural violation of an environmental-protection statute will normally show Article III injury in fact through some environmental injury. But under these statutes, bread-and-butter economic injuries still support Article III standing. *See Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674–75 (5th Cir. 1992) (identifying an economic injury as supporting Article III standing for a suit brought to rectify a NEPA violation); *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983) ("Injury in fact *is not confined* to economic injury . . . ." (emphasis added)). Of course, the defendants' argument is well-taken with respect to whether Congress has granted EIP a cause of action, and forms the basis for our conclusion that EIP lacks statutory standing.

No. 17-30441

280–81 n.14 (1978), or on an equal basis for government contracts, *see Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). This rationale extends beyond equal-protection claims and is well-suited for the facts before us. *Cf. Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (finding injury in fact when the challenged action deprived the party of "a chance to obtain a settlement that respected their priority" in bankruptcy); *Serrato v. Clark*, 486 F.3d 560, 566 (9th Cir. 2007) (same for denial of opportunity "to be *considered* for a program that would have allowed [the plaintiff] to serve only six months in prison"); *All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (same for deprivation of plaintiffs' "rights to compete on an equal footing in interstate commerce").

It is true that EIP still has its credits and can sell them later. But, the delay in recovering its investment and the lingering uncertainty that it will ever be recouped constitutes economic harm. Even if this harm is small, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *See Czyzewski*, 137 S. Ct. at 983; *see also McGowan v. Maryland*, 366 U.S. 420, 424, 430–31 (1961) (finding that appellants fined five dollars plus costs had standing to assert an Establishment Clause challenge).

Moving on, EIP's injury is fairly traceable to the asserted NEPA violation. This is not a case where an "intervening, independent act of a third party" was "a necessary condition of the harm's occurrence." *See Texas v. United States*, 787 F.3d 733, 752–53 (5th Cir. 2015) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013)). Nor is it one where the "challenged action has played a minor role" in causing the harm. *See id.* EIP's lost chance to unload its credits flowed directly from the Corps' decision not to consider mitigation banks as an alternative.

Lastly, EIP meets the relaxed standard for redressability. While it is not likely, there is at least "some possibility" that enjoining the New Zydeco Ridge

project until the Corps reviews alternatives would "prompt the [Corps] to reconsider [its] decision" not to use EIP's credits. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Of course, EIP "cannot establish with any certainty that" after review the Corps would buy EIP's credits. *See Lujan*, 504 U.S. at 572 n.7. But given EIP's assertion that its bank is the only one available to offset the HSDRRS's damage to the brackish marsh, and its assertion that it could eventually offset the same number of AAHUs as the New Zydeco Ridge project, it is at least a possibility. *See Sierra Club*, 156 F.3d at 613; *cf. Texas*, 787 F.3d at 753–54 (holding that a party asserting a procedural right showed redressability because an injunction barring action pending notice and comment "could prompt [the agency] to reconsider its decision").[4]

Convinced that EIP has Article III standing, we next turn to whether it has statutory standing under NEPA. We conclude that it does not.

## III.

While NEPA imposes a variety of obligations upon federal agencies, NEPA does not confer a private cause of action to enforce its provisions. *See Fla. Audubon Soc'y*, 94 F.3d at 665. Accordingly, a private party seeking to rectify a NEPA violation must bring suit through the APA, *see id.*, which confers standing to an entity "adversely affected or aggrieved by agency action

---

[4] The Government argues that EIP's failure to show that NEPA affords it a right to sell its credits means that EIP suffered no injury in fact. We reject the Government's attempt to link the discrete issues of Article III standing and EIP's failure to state a claim. The Government's argument is fatally flawed because it "confuses weakness on the merits with absence of Article III standing." *See Davis v. United States*, 564 U.S. 229, 249 n.10 (2011). "[T]he question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion." *Bond v. United States*, 564 U.S. 211, 219 (2011) (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 92 (1998)). And this argument is undermined by *Sabine River*. There, we "put the proverbial cart before the horse" and assumed that a statutory violation occurred. *See Sabine River*, 951 F.2d at 676. This allowed us to conclude that the plaintiffs had both Article III and statutory standing. *Id.* It also meant that we rejected the district court's conclusion that because no statutory violation occurred, the plaintiffs' injuries were outside the zone of interests protected by NEPA. *Id.* at 673.

within the meaning of a relevant statute," *see* 5 U.S.C. § 702. This requirement is satisfied if the plaintiff asserts an interest "'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). This "zone of interests" test "is not meant to be especially demanding." *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). It "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

Congress's purpose in enacting NEPA was to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.[5] Naturally, NEPA's zone of interests covers environmental injuries and not purely economic ones.[6] *See Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8

---

[5] While NEPA's statement of purpose does provide that Congress sought to "stimulate the health and welfare of man," *see* 42 U.S.C. § 4321, the Supreme Court has held that those two "goals are *ends* that Congress has chosen to pursue by *means* of protecting the physical environment." *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983).

[6] That said, a plaintiff need not be "pure of heart" to vindicate NEPA. *See Realty Income Tr. v. Eckerd*, 564 F.2d 447, 452–53 (D.C. Cir. 1977); *see also Latin Ams. for Social & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 466 (6th Cir. 2014); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996). A plaintiff with both environmental and economic injuries falls within NEPA's zone of interests even if the plaintiff's economic interests are the real "impetus" for its lawsuit. *See Realty Income Tr.*, 564 F.2d at 452. The defendants in this case argue that EIP has no environmental injury, not that EIP's economic interests blight its environmental ones. Accordingly, we need not address whether there are circumstances where an

F.3d 713, 716 (9th Cir. 1993) (collecting cases from the Fourth, Eighth, Ninth, and D.C. Circuits). We have held that NEPA "was designed to protect the environment," not "contractors' rights." *See Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992). Environmental injuries include, but are not necessarily limited to, detrimental effects upon a plaintiff's "recreational use and aesthetic enjoyment." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990).

NEPA's design, not just its purpose, is also crucial for the zone-of-interests analysis. NEPA is known as a "procedural statute." *See, e.g.*, *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 695 n.13 (5th Cir. 2010). That is, it "imposes only procedural requirements to 'ensur[e] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (alteration in original) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). But "NEPA itself does not mandate particular results." *Robertson*, 490 U.S. at 350. It "merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351.

---

overwhelming economic interest may foreclose a party with an environmental injury from asserting a NEPA violation.

We also acknowledge that statutory zones of interests must be construed "not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of law upon which the plaintiff relies." *See Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). Based on this, at least one other circuit has held that purely economic interests may confer statutory standing under NEPA "if the particular NEPA provision giving rise to the plaintiff's suit evinces a concern for economic considerations." *See Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038 (8th Cir. 2002); *see also Cent. S.D. Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 895–96 (8th Cir. 2001) (holding that a specific provision of NEPA does not protect economic interests); *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1125–27 (8th Cir. 1999) (holding that another provision in NEPA does protect pure economic interests). But in this case, neither party argues that the specific NEPA provisions in play evince any concern for economics. We therefore do not address whether any specific NEPA provision permits suit based on pure economic interest.

As NEPA cannot prevent informed-yet-environmentally-destructive actions, we have recognized that an "implicit" injury arises when an agency fails to prepare an EIS—"the creation of a risk that serious environmental impacts will be overlooked." *See Sabine River*, 951 F.2d at 674 (quoting *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975)). This sort of injury can occur even when "the fact of actual damage . . . is somewhat speculative." *See Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983) (emphasis removed). The whole "point of the [NEPA] lawsuit" is to uncover the deleterious environmental effects of the agency's project. *See id.* If we imposed a higher standard, we "would in essence be requiring" the plaintiff to "conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *See City of Davis*, 521 F.2d at 671.

But while we have recognized that such "implicit" NEPA injuries may be "somewhat speculative," we have not relaxed the necessary showing of environmental injury to the point of meaninglessness. As we held in *Sabine River*, plaintiffs must have "a sufficient geographical nexus to the site of the challenged project [such that they can] expect [ ] to suffer whatever environmental consequences the project may have." *See* 951 F.2d at 674 (alterations in original) (quoting *City of Davis*, 521 F.2d at 671); *see also Save Our Wetlands*, 711 F.2d at 640 (NEPA injury established by a history of fishing and plans to fish "in the general area of the project"); *Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322, 323–25 (5th Cir. 1980) (NEPA injury established by residing near the bay into which the project would expel wastewater).

In this case, the question of whether EIP has statutory standing comes to us after a Rule 12(b)(6) dismissal. We therefore apply the *Twombly/Iqbal* standard. *See Harold H. Huggins Realty*, 634 F.3d at 796. Under this standard, EIP's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This is "a context-specific task that requires" us to draw on our "judicial experience and common sense." *See id.* at 679. "[A]ll well-pleaded facts" must be viewed "as true and . . . in the light most favorable to" EIP. *See Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)). We consider EIP's whole complaint, *see United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 321 (5th Cir. 2016), and limit our inquiry to "the contents of the pleadings, including attachments thereto," *see Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).

As EIP's precise allegations in its complaint are of particular importance, we recite the relevant ones here. EIP's complaint alleged that it is a Delaware LLC with its principal place of business in Maryland. According to EIP's complaint, its mitigation bank is located on the East Orleans Land Bridge in Orleans Parish, Louisiana, and the Corps' New Zydeco Ridge project is located within the Big Branch National Wildlife Refuge near Slidell, Louisiana. Per EIP's complaint, the New Zydeco Ridge project would offset 23.7 AAHUs worth of damage, and EIP could eventually supply credits worth 25 AAHUs. EIP also claims that the Corps' HSDRRS would cause "negative impacts to wildlife habitat." EIP finally alleges that the public's interest "will not be disserved by a permanent injunction" against building the New Zydeco Ridge project and that EIP "will suffer irreparable harm in the absence of injunctive relief, as the Corps'[] actions have bypassed the use of EIP's" mitigation bank.

We conclude that EIP has not pleaded facts showing an injury within NEPA's zone of interests. From its assertions in its complaint, we discern no environmental injury to EIP (or anyone else for that matter). At the outset, EIP's clearest assertion of injury—that it "will suffer irreparable harm" from

the bypassing of its bank—relates to its pocketbook not the environment. And EIP only asserts that the public's interest "will not be disserved" by stopping the New Zydeco Ridge project, not that the public's interest will be served by, say, stopping some undiscovered environmental harm.

EIP did affirmatively allege that the HSDRRS would cause "negative impacts to wildlife habitat." But this harm is unrelated to the NEPA violation EIP asserts or the relief it requests. What EIP alleged was that the Corps' SIER—which set forth and analyzed the Corps' WRDA-required plan for mitigating the HSDRRS's damage—violated NEPA. It also asked the district court to stop the New Zydeco Ridge project. EIP did not claim that the HSDRRS itself did not comply with NEPA. Nor did it seek to stop the HSDRRS. This mismatch devastates EIP's case. Our inquiry focuses on "whether the particular plaintiff is entitled to an adjudication of the *particular claims* asserted" and "each form of relief sought." *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (alteration in original) (first quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984); then quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). EIP's failure to tie its claim and relief sought to the HSDRRS means it cannot use the environmental harms flowing from the HSDRRS to establish statutory standing.

Moving on, EIP tries to establish that it will suffer an environmental injury from the New Zydeco Ridge project itself. EIP stumbles out of the gate, however, as it did not affirmatively allege that any environmental harm— known or unknown—could flow from the project. In fact, EIP instead seemed to allege that the project would be eco-friendly—it would "replace the brackish marsh habitats that were impacted" by the HSDRRS. EIP resists this conclusion in three ways. First, EIP established environmental injury, so the argument goes, simply by asserting a NEPA violation along with proximity to the project. Second, EIP submits that the mitigation from its credits would be

faster and more certain than the Corps-constructed project. Third, EIP argues that even if it lacks an environmental injury, stopping the Corps' project will vindicate its free-floating interest in environmental protection. All three arguments fail.

EIP's first argument—that geographic proximity plus a NEPA violation equals environmental injury—oversimplifies things and thus distorts the law. Admittedly, a party's proximity can usually allow an inference that she will be exposed to unrevealed environmental risks. *See Sabine River*, 951 F.2d at 674. Proximity can be a good proxy for whether a party will bear the unforeseen consequences of an agency's project. It goes without saying that a homeowner could get hurt if something goes wrong at a federally licensed dam being built next door. *See Lujan*, 504 U.S. at 572 n.7. It is "[a]n obvious inference" that "residents of a geographical area 'use' that geographical area" such that those residents need not allege specific acts like "camping, hiking, fishing or sightseeing" to establish environmental injury. *See Save the Bay*, 610 F.2d at 325. We know that if things go awry, nearby residents will hear the commotion, breathe the polluted air, drink the toxic sludge, see the dead animals, or get flooded. The nearby resident thus can "expect [ ] to suffer whatever environmental consequences the project may have." *See Sabine River*, 951 F.2d at 674 (quoting *City of Davis*, 521 F.2d at 671).

But this case is a good example of why proximity can sometimes be a poor proxy for injury. In this case, nothing in EIP's complaint indicates that EIP uses or enjoys its bank's brackish marsh or the area nearby. And it is not an "obvious inference" that a Delaware LLC with its principal place of business in Maryland uses or enjoys its wetlands located in Louisiana in any way a resident would. So even though EIP owns property somewhat nearby, from EIP's complaint we cannot see how it will "suffer whatever environmental consequences the project may have." *See id.*

A further defect in EIP's proposed formula exists. *Sabine River*'s usually applicable logic—that a NEPA violation means an environmental harm may be overlooked—has little purchase in this case. The New Zydeco Ridge project is a *mitigation* project designed to offset damage from the HSDRRS. In the past, when we and other courts have found implicit environmental injury, it has been for projects like the construction of a wastewater pipeline, *see Save the Bay*, 610 F.2d at 323–24, granting a right of way across wetlands for transmission lines, *see Save Our Wetlands*, 711 F.2d at 637, building a freeway, *see City of Davis*, 521 F.2d at 665, or constructing a port, *see Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 928 (9th Cir. 1988). The potential for environmental damage in such cases is obvious. In this case, by contrast, commonsense indicates that a mitigation project will be environmentally net beneficial and pose little risk. EIP's bare allegation that the Corps' mitigation project violates NEPA, without more, is insufficient to present even a speculative threat to EIP. *Cf. Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 953–54 (9th Cir. 2006) (finding no injury when the plaintiff "fail[ed] to explain why the new, on average more protective, regulation present[ed] a credible threat to its members' health").[7]

*Sabine River*'s logic is inapplicable for yet another and more important reason: EIP pleaded the wrong kind of NEPA violation. It alleged that the Corps overlooked alternatives, not risks. EIP's complaint was that the Corps' SIER did not consider alternatives that could offset a similar amount of environmental damage as the New Zydeco Ridge project. *See* 42 U.S.C. § 4332(C)(iii). But EIP did not submit that the Corps failed to calculate

---

[7] We need not address whether a mitigation project supported by some plausible allegation of how environmental harm could arise can ever give rise to an environmental injury. We also do not need to address the circumstance where a person alleges that his aesthetic preferences will be harmed by a mitigation project which replaces one habitat with another.

No. 17-30441

properly the environmental impact of its project. *See id.* § 4332(C)(i). This case consequently diverges from prior ones finding implicit injury based on an agency's failure to prepare an EIS at all. *See Sabine River*, 951 F.2d at 673; *Save Our Wetlands*, 711 F.2d at 638–39; *Save the Bay*, 610 F.2d at 325. Given that the NEPA-mandated inquiry designed to reveal issues with the New Zydeco Ridge project has already been done, we require more specificity about what harms might flow from the project. EIP's failure to do so renders any environmental injury "too speculative to support [its] standing." *See Sabine River*, 951 F.2d at 675 (quoting *S. E. Lake View Neighbors v. Dep't of Hous. & Urban Dev.*, 685 F.2d 1027, 1035 (7th Cir. 1982)).

EIP's second point—that even if the Corps' project is environmentally beneficial, EIP's bank would offset damage faster and with more certainty— makes no sense. Putting to the side whether an entity can create its own NEPA standing by building environmentally beneficial projects, there is no tradeoff between the New Zydeco Ridge project and EIP's bank. In this, EIP is different from the plaintiffs in *Sabine River*, who had standing to enjoin an environmentally beneficial agency action. *See* 951 F.2d at 676. There, the agency's action—acceptance of a non-development easement—would foreclose the plaintiffs' better proposed use for the land—building a water reservoir upon it. *See id.* at 672–73. Here, by contrast, EIP's mitigation bank and the Corps' project can coexist. Per EIP's complaint and briefing, its bank is already built and the credits dispersed.[8] Any environmental benefits the New Zydeco

---

[8] While the Corps can release credits before the mitigation bank is built, *see* 33 C.F.R. § 332.2, EIP's briefing states that the wetlands in its bank are "already restored." And EIP's complaint alleged that the Corps could meet its mitigation target by "acquiring an already constructed project, i.e., acquiring mitigation bank credits from private parties holding wetlands . . . that previously have been restored, enhanced, or preserved and then 'banked' in order to be readily available to offset the negative impacts to wildlife habitat resulting from projects like the HSDRRS."

Ridge project brings are in addition to, not subtraction from, the benefits of EIP's bank.

EIP's third argument—that an injunction will vindicate its free-floating interest in environmental protection—is unavailing. To show it has an interest in environmental protection, EIP cites its status as a mitigation banker. It also supplies us with a variety of facts about its mission and past projects, none of which was alleged in its complaint. We will not consider these materials. *See Brand Coupon*, 748 F.3d at 635 (holding that district courts are generally limited to the pleadings when evaluating 12(b)(6) motions); *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) ("A party who neglects to ask the district court for leave to amend cannot expect to receive such a dispensation from the court of appeals."). But even were we to consider them, our conclusion would stay the same. EIP's "mere 'interest in a problem,'" no matter its sincerity or expertise, "is not sufficient by itself to render [EIP] 'adversely affected' or 'aggrieved' within the meaning of the APA." *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). A NEPA plaintiff must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within" NEPA's zone of interests. *See Nat'l Wildlife Fed'n*, 497 U.S. at 883; *see also Sierra Club*, 405 U.S. at 733 (requiring a link between the Article III injury in fact and the interest asserted under the zone-of-interests test); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (same). A party cannot simply rely on its or the public's free-floating interest in environmental stewardship. *See Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 190 (3d Cir. 2016) (requiring environmental injury to the NEPA plaintiff itself or those it represents); *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) (same). And, as explained above, we cannot deduce from EIP's complaint how anyone, let alone EIP, will suffer an environmental injury from the Corps'

No. 17-30441

mitigation project. Accordingly, there is not even a free-floating environmental interest for EIP to vindicate.

As a final effort, EIP argues it is well-suited to vindicate the Government's overall statutory and regulatory scheme governing environmental-mitigation credits. According to EIP, as a mitigation-bank sponsor it plays a central role in the Government's overall policy of requiring offsets for environmental damage. EIP claims that mitigation-bank credits are the statutory and regulatory preferred means to satisfy the Government's mitigation needs. *See* Water Resources Development Act of 2007, Pub. L. No. 110-114, § 2036(c), 121 Stat. 1041, 1094 (2007), *amended by* Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, § 1163, 130 Stat. 1628, 1669–70 (2016) (codified as amended at 33 U.S.C. § 2317b); 33 C.F.R. 332.3(b)(2). To that effect, EIP supplies us with a myriad of regulations which extol the potential benefits of mitigation banks. *See, e.g.*, Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 Fed. Reg. 58,605–02, 58,607 (Nov. 28, 1995). EIP further argues that the Corps' decision to overlook mitigation credits diminishes private companies' incentives to build and invest in mitigation banks.

We find this set of arguments unpersuasive. We need not consider what role EIP plays within the Government's overall scheme for mitigation credits. The zone-of-interests test focuses on "the statute whose violation is the gravamen of the complaint," and, more precisely, "the statutory *provision* whose violation forms the legal basis for [the] complaint." *See Nat'l Wildlife Fed'n*, 497 U.S. at 883, 886 (emphasis added); *see also Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). EIP's complaint claims that the Corps violated NEPA, not some broader array of statutes and regulations from which we can infer a statutory or regulatory purpose to protect mitigation bankers.

19

It also does not help EIP that the statutes and regulations in play all regulate the Corps. Merely because two provisions regulate the same agency does not mean those provisions are the same "relevant statute" for purposes of the zone-of-interests test. *See Air Courier Conference of Am. v. Am. Postal Workers Union, AFL–CIO*, 498 U.S. 517, 529–30 (1991). In *Air Courier*, the plaintiffs tried to show standing through a different provision from the one they claimed was violated. *See id.* at 529. The two provisions, which both regulated the Postal Service, had been enacted separately but eventually codified together. *See id.* The Court refused to allow the plaintiffs to "leapfrog from" one provision to the next. *See id.* at 530. Here, we similarly will not permit EIP to leapfrog, not just from one NEPA provision to another, but from NEPA to separately codified statutes as well as regulations promulgated outside the scope of NEPA. "[T]o accept this level of generality in defining the 'relevant statute' could deprive the zone-of-interests test of virtually all meaning." *See id.* at 529–30. And EIP's last argument—that it needs a return on its investment to continue doing mitigation projects—renders it akin to the hypothetical disappointed contractor from *Sabine River* who wants to build an environmentally beneficially project, but needs money to do so. *See* 951 F.2d at 676. In sum, without a plausible allegation of some environmental "harm flowing to" EIP, it cannot establish statutory standing under NEPA. *See id.*

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.